**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 24-21431-CIV-GAYLES/GOODMAN**

**LADENBURG THALMANN & CO. INC.,**

       **Plaintiff,**

**v.**

**ORAGENICS, INC.,**

       **Defendant.**

_____/

**REPORT AND RECOMMENDATIONS ON PLAINTIFF'S**
**VERIFIED MOTION FOR TRO AND PRELIMINARY INJUNCTIVE RELIEF**

A tie, of course, is not a win. So a prediction of victory is overly optimistic when the evidence reveals an even-steven split of 50-50 odds. A plaintiff, therefore, should not obtain injunctive relief if the chances of prevailing are evenly matched. That's because the plaintiff must establish, among other requirements, a substantial likelihood of success on the merits. And an even split among the appellate courts does not enable a plaintiff to clear that legal hurdle. This is the reality here, where our Plaintiff corporation seeks injunctive relief but two of four appellate courts agree (and the other two disagree) with its legal position.

Given this reality, the Undersigned is recommending that the District Court **deny** the Plaintiff's motion for injunctive relief (because it cannot establish a substantial

likelihood of success when the relevant landscape is half-filled with the equivalent of legal quicksand while the other half has safety bridges).

This Report and Recommendations concerns a request by Ladenburg Thalmann & Co. Inc. ("Ladenburg" or "Plaintiff") for a temporary restraining order ("TRO") and preliminary injunction [ECF No. 7]. Ladenburg filed the instant action on April 17, 2024 against Oragenics, Inc. ("Oragenics" or "Defendant"), alleging breach of contract (Count I) and seeking injunctive relief (Count II). [ECF No. 1]. The Complaint was accompanied by the instant TRO and preliminary injunction motion. [ECF No. 7]. Defendant filed a response in opposition. [ECF No. 19]. Plaintiff did not file an optional reply.

United States District Judge Darrin P. Gayles referred this motion to the Undersigned. [ECF No. 8].

On April 26, 2024, the Undersigned held a non-evidentiary hearing where the parties presented legal arguments.[1] [ECF Nos. 10; 20]. At the conclusion of the hearing, the Undersigned directed the parties to file declarations on whether there were any discussions about, or revisions to, the venue selection provision in any draft of the Investment Banking Agreement ("Agreement"), and I offered them an opportunity to submit supplemental legal authority on irreparable harm. [ECF No. 21]. The parties each

---

[1]     In a joint notice, the parties agreed that an *evidentiary* hearing was not necessary. [ECF No. 18].

filed their post-hearing notices of supplemental authorities [ECF Nos. 23; 25] and their respective declarations [ECF Nos. 22; 24].

As discussed in more detail below, the Undersigned **respectfully recommends** that Judge Gayles **deny** Plaintiff's motion for a temporary restraining order and a preliminary injunction [ECF No. 7].

## I.  Background[2]

The parties entered into an Agreement where "Plaintiff would be the investment banker for Defendant during the term of the [A]greement." [ECF Nos. 1, ¶ 3; 1-1]. The Agreement contained the following venue selection clause:

> **Construction; Venue.** This Agreement shall be governed by and construed in accordance with the laws of the State of Florida. **The Company agrees that the sole and exclusive venue for any matters arising hereunder shall be *the* court of competent jurisdiction in Miami-Dade County, Florida and agrees to waive any objections to such venue.** EACH OF LADENBURG AND THE COMPANY HEREBY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY PROCEEDING, SUIT OR CLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR IN ANY WAY RELATING TO THIS AGREEMENT.

[ECF No. 1-1, ¶ (H) (capitalization in original; emphasis added)].

The Complaint alleges that "Defendant thereafter entered into investment banking transactions within the scope of the [A]greement, thereby incurring fees due to

---

[2]    Because no evidentiary hearing was held, the Undersigned makes no factual findings, and the facts summarized in this section are included solely to provide context.

Ladenburg." [ECF No. 1, ¶ 4]. It describes some of the services Plaintiff provided to Defendant pursuant to the Agreement. *Id.* at ¶¶ 20–28.

On August 15, 2023, Defendant sent a termination letter to Plaintiff and refused to pay the fees incurred under the Agreement. *Id.* at ¶¶ 5, 31, 35, 38. According to Plaintiff, Defendant further breached the Agreement by filing a statement of claim to commence an arbitration with the Financial Industry Regulatory Authority ("FINRA"), in violation of the Agreement's venue selection clause. *Id.* at ¶¶ 6–7.

## II.   Applicable Legal Standard

Plaintiff seeks a TRO and a preliminary injunction. [ECF No. 7]. The standard is the same for both. *See Emerging Vision, Inc. v. Glachman*, No. 10-80734-CIV, 2010 WL 3293346, at *3 (S.D. Fla. June 29, 2010), *report and recommendation adopted*, No. 10-80734-CIV, 2010 WL 3293351 (S.D. Fla. Aug. 11, 2010) (citing *Seigel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (*en banc*)).

To obtain a TRO or a preliminary injunction, a party must demonstrate:

(1) a **substantial** likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the nonmovant; and (4) that the entry of the relief would serve the public interest.

*Schiavo ex. Rel Schindler v. Schiavo*, 403 F.3d 1223, 1225–26 (11th Cir. 2005) (emphasis supplied); *see also Levi Strauss & Co. v. Sunrise Int'l. Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995). "Failure to show any of the four factors is fatal." *Am. C.L. Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009).

"While a temporary restraining order may be issued without notice to the adverse party, a preliminary injunction is issued after the adverse party has received notice of the requested relief." *Doc Dev., LLC v. Ewc Franchise Grp., Inc.*, No. 18-21092-CIV, 2018 WL 2007045, at *1 (S.D. Fla. Mar. 23, 2018) (emphasis added). *See* Fed. R. Civ. P. 65(b)(1) ("The court may issue a temporary restraining order without written or oral notice to the adverse party[.]" (alteration added)); *id.* 65(a)(1) ("The court may issue a preliminary injunction only on notice to the adverse party.").

The Supreme Court has stated that the notice required under Rule 65(a) "implies a hearing in which the defendant is given a fair opportunity to oppose the application and to prepare for such opposition." *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cty.*, 415 U.S. 423, 448 n.6, 94 S. Ct. 1113, 39 L. Ed. 2d 435 (1974). In the instant case, Oragenics *was* served with, among other things, the Complaint and the instant motion, filed a response, and fully participated in the April 26, 2024 hearing. [ECF Nos. 11; 20].

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S. Ct. 1830, 1834, 68 L. Ed. 2d 175 (1981). The issuance of a preliminary injunction is "an extraordinary and drastic remedy not to be granted unless the movant clearly establishe[s] the 'burden of persuasion' as to the four requisites."

*McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998) (citing *All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc.*, 887 F.2d 1535, 1537 (11th Cir. 1989)).

"If a party establishes the right to a preliminary injunction, its scope 'must be narrowly tailored to fit specific legal violations, because the district court should not impose unnecessary burdens on lawful activity.'" *United States v. Bacaner*, No. 8:21-CV-0391-T-VMC-SPF, 2021 WL 3508135, at *5 (M.D. Fla. Aug. 3, 2021), *report and recommendation adopted*, No. 8:21-CV-391-VMC-SPF, 2021 WL 4948149 (M.D. Fla. Sept. 1, 2021) (quoting *Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*, 304 F.3d 1167, 1178 (11th Cir. 2002)).

## III.    Timing of Plaintiff's Motion

Ladenburg states that Defendant's FINRA statement of claim was "recently submitted." [ECF No. 7, p. 3]. But Oragenics served Plaintiff with its statement of claim on March 12, 2024. [ECF No. 19, p. 1]. Thus, Plaintiff allowed approximately **36 days** to lapse between the service of the FINRA statement of claim and the date it initiated the instant action and filed its request for injunctive relief.

Defendant disputes the claimed expediency of the instant motion. It notes that Plaintiff had "fifty full days [from the date of service] to file an Answer" with FINRA. *Id.* Defendant argues that "Plaintiff cannot sit on its hands for over thirty days, only to file a motion with this Court and claim an emergency exists to justify an expedited hearing

because it only has two weeks left to submit an Answer in FINRA when it raised no such complaint in the thirty-six days prior to filing." *Id.* at 2.

The Eleventh Circuit has stated that "[a] delay in seeking a preliminary injunction of even only a few months -- though not necessarily fatal -- **militates against a finding of irreparable harm**." *Wreal, LLC v. Amazon.Com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016) (emphasis added). This is because "the very idea of a preliminary injunction is premised on the need for speedy and urgent action to protect a plaintiff's rights before a case can be resolved on its merits." *Id.*

The *Wreal* Court addressed a five-month delay in seeking preliminary injunctive relief. But "it is not uncommon for courts to deny a preliminary injunction in the face of unexplained delays of more than two months." *InVue Sec. Prod. Inc. v. Vanguard Prod. Grp., Inc.*, No. 8:18-CV-2548-T-33SPF, 2019 WL 4671143, at *6 (M.D. Fla. July 1, 2019), *report and recommendation adopted*, No. 8:18-CV-2548-T-33SPF, 2019 WL 4673755 (M.D. Fla. Aug. 15, 2019).

Here, Plaintiff's over-one-month delay is not enough to **foreclose** a finding of irreparable harm. Nonetheless, as discussed below, Plaintiff has failed to show entitlement to the extraordinary remedy of injunctive relief.

## IV.     Analysis

Plaintiff seeks the entry of a "[TRO] and/or preliminary injunction enjoining and restraining Defendant from further pursuing its arbitration before FINRA and directing Defendant to discontinue that arbitration forthwith." [ECF No. 7, p. 3].

As noted above, to obtain a TRO and/or a preliminary injunction, Ladenburg must show: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. *Wreal, LLC*, 840 F.3d at 1247. For the reasons discussed below, Plaintiff is not entitled to injunctive relief.

### A.     Substantial Likelihood of Success on the Merits

The first factor requires an analysis of a plaintiff's ability to make a showing of each of the required elements of the claims asserted. *See Seiko Kabushiki Kaisha v. Swiss Watch Int'l, Inc.*, 188 F. Supp. 2d 1350, 1353–55 (S.D. Fla. 2002). Ladenburg contends that it has a substantial likelihood of success on the merits because the Agreement's venue selection clause "unequivocally mandates that the parties litigate any legal disputes relating to the subject agreement in a State or Federal Court of competent jurisdiction located in Miami-Dade County." [ECF No. 7, p. 4]. According to Plaintiff, "FINRA does not have jurisdiction over this matter; rather, solely this Court has jurisdiction, pursuant

to the unambiguous and mandatory forum selection clause in the parties' operative . . . Agreement." *Id.* at 1–2.

Plaintiff states that the venue selection provision "is clearly mandatory (and not permissive), because it expressly and unambiguously provides that the '**sole and exclusive venue for any matters arising hereunder shall be**' either State or Federal Courts located in Miami-Dade County." [ECF No. 7, p. 6 (quoting – and paraphrasing -- paragraph H of Agreement (emphasis in motion))]. It claims that both parties are sophisticated entities who "negotiated and ultimately signed the Investment Banking Agreement with the subject forum selection clause." *Id.* [But, as discussed below, this clause was already included in the first draft of the Agreement and the parties never discussed it.]. Plaintiff also notes that "Section F [of the Agreement] contains a standard merger clause that the subject [A]greement is, indeed, the entire agreement." *Id.* at 4.

The Agreement itself does not contain an arbitration provision. If the Agreement were the only consideration, then Plaintiff would have an easier time persuading the Court of its position that venue lies in this District. But Plaintiff must also contend with FINRA Rule 12200.

### 1.      FINRA Rule 12200

As the Eleventh Circuit has stated:

Despite the absence of a direct, written agreement, **an agreement to arbitrate still may be found based on [an entity]'s membership in FINRA**. FINRA is a self-regulatory organization established under the Securities

Exchange Act of 1934, 15 U.S.C. § 78o-3, with "the authority to exercise comprehensive oversight over all securities firms that do business with the public." *UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc.*, 660 F.3d 643, 648 (2d Cir. 2011) (internal quotation marks omitted). **When [an entity] join[s] FINRA, it agree[s], like all other FINRA members, to comply with FINRA's rules.** *See id.* **(citing FINRA Bylaws art. 4 § 1). These rules include FINRA Rule 12200, which requires a FINRA member and its associated persons to arbitrate certain disputes with customers before FINRA upon the customer's demand**. *See* FINRA Rule 12200 (requiring arbitration when it is "[r]equested by the customer," "[t]he dispute is between a customer and a member or associated person of a member," and "[t]he dispute arises in connection with the business activities of the member or the associated person"). **[The entity]'s agreement when joining FINRA thus may "itself constitute[ ] the agreement" to arbitrate.** *MONY Sec. Corp. v. Bornstein*, 390 F.3d 1340, 1342 (11th Cir. 2004).

*Pictet Overseas Inc. v. Helvetia Tr.*, 905 F.3d 1183, 1187 (11th Cir. 2018) (emphasis added; footnote omitted).

FINRA Rule 12200 states, in its entirety, as follows:

**Parties <u>must</u> arbitrate a dispute under the Code if:**

- Arbitration under the Code is either:

    (1) Required by a written agreement, or

    **(2) Requested by the customer**;

- **The dispute is between a customer and a member** or associated person of a member; and

- **The dispute arises in connection with the business activities of the member** or the associated person, except disputes involving the insurance business activities of a member that is also an insurance company.

[ECF No. 19-7 (emphasis added)].

Addressing Rule 12200 in the context of a motion to compel arbitration, this Court in *Tradespot Markets Inc. v. Icaro Media Grp. Inc.*, noted that:

> **Both the Supreme Court and Eleventh Circuit have explained that courts must interpret the FINRA Code "as it would a contract under the applicable state law."** [*MONY Securities Corp.*, 390 F.3d at 1342] (citing *Multi-Fin. Sec. Corp. v. King*, 386 F.3d 1364, 1367 (11th Cir. 2004); *Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987)). "Because the FINRA Arbitration Code is unambiguous, the parties' intent must be gleaned from the four corners of the document." [*Pictet Overseas Inc.*, 905 F.3d at 1188] (quoting *Crawford v. Barker*, 64 So. 3d 1246, 1255 (Fla. 2011) (internal quotations omitted)). "[T]he language of the Code itself is the best evidence of the parties' intent, and its plain meaning controls." *Id.* (internal quotation marks omitted). **And "unlike other contracts, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."** *King*, 386 F.3d at 1367 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983) (internal quotations omitted)). **It is well settled that the FINRA Code constitutes a written agreement to arbitrate**. *Deutsche Bank Sec. Inc. v. Simon*, No. 19-20053, 2019 WL 4864465, at *3 (S.D. Fla. Aug. 20, 2019), *report and recommendation adopted*, 2019 WL 4685876 (S.D. Fla. Sept. 26, 2019) (internal citations omitted).

No. 21-CIV-62295-RAR, 2022 WL 3701201, at *2 (S.D. Fla. Apr. 1, 2022).

Under Rule 12200, a FINRA member must arbitrate a dispute if it is: "(1) required by written agreement or **(2) requested by the customer; the dispute is between a customer and a member or associated person of a member; and (3) the dispute arises in connection with the business activities of the member or associated person**." *Id.* (citing *MONY Securities Corp.*, 390 F.3d at 1342) (emphasis added).

11

The conditions of Rule 12200 are met here. **First**, there is no dispute that Ladenburg is a FINRA member. [ECF Nos. 1, ¶ 13; 19, p. 3].[3]

**Second**, Oragenics maintains that it is a "customer" of Ladenburg. [ECF No. 19, p. 5 (citing *Tradespot Mkts. Inc.*, 2022 WL 3701201)]. Ladenburg has not mounted any direct opposition to Oragenics' customer status. [For instance, Ladenburg has not argued that Rule 12200 is inapplicable because Oragenics is not a customer.].

In *Tradespot Mkts. Inc.*, this Court noted that "[t]he FINRA Code does not define 'customer,' except to state that a 'customer shall not include a broker or dealer.'" 2022 WL 3701201, at *2 (quoting *Sagepoint Fin. Inc. v. Small*, No. 15-CV-0571, 2015 WL 2354330, at *4 (E.D.N.Y. May 15, 2015) (citing FINRA, Rule 12100(k))). The *Tradespot* Court held that the defendant was a customer because "[the] [p]laintiff agreed to accept a fee for its services when the parties' [a]greement was executed—and [the] [d]efendant, a non-broker and non-dealer, undertook to purchase [p]laintiff's services." *Id.*

Similarly here, Oragenics is not a broker or a dealer. [ECF No. 1, ¶ 12 ("Oragenics is a development-stage company dedicated to developing drugs, therapies and vaccines through intra-nasal delivery.")]. The Complaint alleges that, pursuant to the Agreement, Ladenburg provided certain investment banking services to Oragenics for a fee. *Id.* at ¶¶

---

[3]    Defendant points out in its response that Ladenburg has "purposefully avail[ed] itself to the FINRA forum . . . dozens, if not hundreds of times over the years[.]" [ECF No. 19, p. 4].

3–5. Given these allegations, the Undersigned concludes that Oragenics is a customer under the FINRA Rules.

**Third**, the dispute at issue -- whether Oragenics owes Ladenburg any money under the Agreement -- arises from Ladenburg's business activities. The Complaint alleges that under the Agreement, "Plaintiff would be the investment banker for Defendant during the term of the agreement." [ECF No. 1, ¶ 3]. "The FINRA Rules . . . suggest[ ] that the business activities of a FINRA member involve 'investment banking or securities business.'" *UBS Fin. Servs., Inc. v. Carilion Clinic*, 706 F.3d 319, 325 (4th Cir. 2013) (discussing what it means to be a "customer" and quoting FINRA Rule 12100(r)).

Because Oragenics, as a customer of Ladenburg, has requested arbitration (and all other conditions of Rule 12200 are met), Ladenburg, as a FINRA member, is obligated to participate in that arbitration, *unless* Oragenics waived its right to arbitrate. Thus, in order to show a substantial likelihood of success on the merits (and keep this action in federal court), Plaintiff needs to displace FINRA Rule 12200.

### 2.   The Parties' Arguments

As noted above, the Agreement contains the following venue selection clause:

**Construction; Venue.** This Agreement shall be governed by and construed in accordance with the laws of the State of Florida. **The Company agrees that the sole and exclusive venue for any matters arising hereunder shall be the court of competent jurisdiction in Miami-Dade County, Florida and agrees to waive any objections to such venue.** EACH OF LADENBURG AND THE COMPANY HEREBY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY PROCEEDING, SUIT OR CLAIM (WHETHER

BASED UPON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF
OR IN ANY WAY RELATING TO THIS AGREEMENT.

[ECF No. 1-1, ¶ (H) (capitalization in original; emphasis added)].

Plaintiff argues that this venue selection clause supersedes FINRA Rule 12200.

[ECF No. 7, pp. 6–9]. In doing so, it relies on decisions from the Southern District of New

York and the Second Circuit, finding that valid forum selection clauses displaced Rule

12200. *Id.* at 7–9. It also distinguishes this Court's decision in *Tradespot Mkts. Inc.*, 2022

WL 3701201, on the ground that the forum selection clause in that case was "vague" and

"permissive," whereas section H is unambiguous and mandatory. *Id.* at 9–10.[4]

---

[4]      The forum selection clause in *Tradespot Mkts. Inc.*, stated that:

**The Company and Tradespot each hereby irrevocably submits to the
jurisdiction of any Florida State or Federal court sitting in Broward
County Florida** over any action or proceeding arising out of or relating to
this Agreement and the Company and Tradespot **each hereby irrevocably
agree that all claims in respect of such action or proceeding may be heard
and determined in such New York State or Federal Court**.

2022 WL 3701201, *3 (emphasis added).

The Court noted that this language was ambiguous because it was susceptible to
multiple reasonable interpretations (*i.e.*, "were the parties meant to litigate disputes in
Broward County, Florida, New York, or both? Is the clause mandatory or permissive—
may their disputes be heard by a certain court, or do they irrevocably submit to the
jurisdiction of a specific court?"). *Id.* (footnote omitted). [Because of this ambiguity, the
Court did not analyze whether the clause was mandatory or permissive, but nonetheless
noted that another court had deemed permissive "much of the language found in the
forum selection clause." *Id.* at n.2 (citing *LFR Collections LLC v. Phillip H. Taylor, M.D., J.D.,
P.A.*, No. 11-CV-1117, 2011 WL 4736360, at *3 (M.D. Fla. 2011)).].

14

Defendant, on the other hand, cites to those cases finding no waiver where the forum selection clause failed to provide adequate notice to the contracting party that it was waiving FINRA arbitration. [ECF No. 19, pp. 11–14 (citing various cases, including *UBS Fin. Servs., Inc. v. Carilion Clinic*, 706 F.3d 319 (4th Cir.2013) and *Reading Health Sys. v. Bear Stearns & Co.*, 900 F.3d 87 (3d Cir. 2018))].

In those cases, the appellate courts held that the forum selection clauses at issue did **not** displace FINRA Rule 12200 because they did not provide clear notice. *See Carilion Clinic*, 706 F.3d at 330 ("[W]e believe that it would never cross a reader's mind that the clause provides that the right to FINRA arbitration was being superseded or waived. No word even suggesting supersedence, waiver, or preclusion exists in the sentence."); *Reading Health Sys.*, 900 F.3d at 103 ("Without a specific reference to arbitration, the forum-selection clause requiring parties to litigate actions 'arising out of' the contract and related transactions lacks the specificity required to advise [a party] that it was waiving its affirmative right to arbitrate under FINRA 12200.").

Oragenics argues that, like the aforementioned cases, section H makes no reference to arbitration and therefore does not waive it. [ECF No. 19, p. 14]. Additionally, it argues that the clause is ambiguous because it refers to "*the* court of competent jurisdiction in

---

In short, the *Tradespot* Court determined that because the forum selection clause was ambiguous and did not establish Broward County, Florida as the *exclusive* jurisdiction for the parties' dispute, it did not displace FINRA Rule 12200. *Id.*

Miami-Dade County, Florida" (emphasis supplied) in the singular form and "there is more than one court in Miami-Dade County." *Id.* at 10.

Defendant cites no legal authority to support its argument that reference to the court (singular) in Miami-Dade County is an ambiguity. Whereas Plaintiff cites to cases which have interpreted forum selection clauses designating a specific county in Florida to include state and federal courts in that county. [ECF No. 7, p. 5]. But none of Plaintiff's cases involve a venue selection clause which used the term court (singular).

In any event, when a litigant raises an argument only generally and fails to offer specific factual contentions or fails to support the argument with legal authority, a court may summarily reject the argument. *United States Steel Corp. v. Astrue*, 495 F.3d 1272, 1287 n.13 (11th Cir. 2007) (refusing to address a "perfunctory and underdeveloped argument" with no citation to legal authority and collecting cases).

Defendant also notes that other courts have interpreted similar clauses to be permissive (not mandatory). *Id.* at 10 (citing *Pitchford v. Aelitis, SAS*, No. 8:12-CV-1897-T35-TGW, 2013 WL 12155928, at *5 (M.D. Fla. Apr. 11, 2013); *Stateline Power Corp. v. Kremer*, 148 F. App'x 770, 771 (11th Cir. 2005)).

16

Oragenics further relies on FINRA's Regulatory Notice 16-25[5] and FINRA Rule 12209.[6] It argues that, by including the venue selection clause in the Agreement and filing the instant federal court action, Ladenburg violated FINRA's Rules. According to Oragenics, by purportedly violating FINRA's Rules, Ladenburg comes to this Court with unclean hands and this ground alone is sufficient to deny Ladenburg's request for

---

[5]     Regulatory Notice 16-25 states, in relevant part, that:

> FINRA reminds member firms that **customers have a right to request arbitration at FINRA's arbitration forum at any time and <u>do not forfeit that right under FINRA rules by signing any agreement with a forum selection provision</u> specifying another dispute resolution process or an arbitration venue other than the FINRA arbitration forum**.
>
> ***
>
> **FINRA rules set forth specific requirements relating to predispute arbitration agreements and when a customer dispute must be arbitrated at FINRA. They are not default rules that may be overridden by more specific or separate contractual terms without consequences under FINRA rules. Thus, any member firm's denial, limitation or attempt to deny or limit a customer's right to request FINRA arbitration, even if the customer seeks to exercise that right after having agreed to a forum selection clause specifying a venue other than a FINRA arbitration forum, would violate FINRA Rules 2268 and 12200**. In addition, in FINRA's view, the failure to submit a dispute to arbitration under the Customer Code as required by the Code would violate FINRA Rule 2010 (Standards of Commercial Honor and Principles of Trade).

[ECF No. 19-8, pp. 2, 6 (emphasis added; footnote omitted)].

[6]     FINRA Rule 12209 provides that: "During an arbitration, no party may bring any suit, legal action, or proceeding against any other party that concerns or that would resolve any of the matters raised in the arbitration." *See* https://www.finra.org/rules-guidance/rulebooks/finra-rules/12209 (last visited May 2, 2024).

17

equitable relief. [ECF No. 19, p. 9 (citing *S.E.C. v. Lauer*, 445 F. Supp. 2d 1362, 1366 (S.D. Fla. 2006) for the proposition that a party "who comes into equity must come with clean hands")].

The Court does not need to address Oragenics' unclean-hands argument because (as discussed below) Ladenburg cannot show a substantial likelihood of success on the merits.

### 3.    The Agreement's Formation

At the hearing, Plaintiff emphasized the sophisticated nature of the parties, who "negotiated" the terms of the Agreement with the assistance of counsel. To that end, the Undersigned instructed the parties to "file on CM/ECF a declaration (signed by an appropriate representative for that party's side) explaining whether the parties ever had any negotiations or exchanged any draft investment banking agreements concerning the specific issue of whether there would be a venue selection clause." [ECF No. 21, p. 1]. The Order instructed the parties to attach the relevant pages of any such draft(s). *Id.* at 1–2.

As noted above, each side filed their declaration. [ECF Nos. 22; 24]. Plaintiff filed the declaration of Nicholas Stergis, a managing director of Ladenburg, who is "the individual with primary knowledge at Ladenburg regarding the negotiations of the [Agreement]." [ECF No. 24-1, ¶ 1]. Stergis attests that he forwarded a draft of the Agreement to Oragenics' CEO which "was substantially similar to a prior agreement between Ladenburg and Oragenics in February 2018, with the same venue provision as

in the final agreement" *Id.* at ¶¶ 7–8. Although Oragenics made "extensive changes to the Agreement," it "made no changes to the venue provision." *Id.* at 11.

Ladenburg accepted most of Oragenics' proposed changes and provided a second draft to Oragenics' CEO. *Id.* at ¶ 12. She "made additional changes to the Agreement, and again did not modify the venue provision." *Id.* at ¶ 13. Ladenburg accepted those changes and on December 8, 2022, Oragenics' CEO returned a fully executed agreement. *Id.* at ¶¶ 14–15.

The parties twice agreed to extend the Agreement. In both instances, the extension provided that "[a]ll other provisions of the Original Agreement shall remain unchanged and shall continue in full force and effect." *Id.* at ¶¶ 16–20. To the best of Stergis' recollection "**at no time during the original discussions regarding the February 2018 agreement, or the December 2022 Agreement, or the First Amendment or the Second Amendment, did Oragenics question or dispute the venue provision** wherein [the parties] agreed that all disputes would be resolved in court." *Id.* at ¶ 21 (emphasis added).

Defendant filed the declaration of Mark A. Catchur, the attorney who represented Oragenics in connection with the Agreement. [ECF No. 22, ¶ 2]. Catchur attests that "[t]he forum selection clause at issue, located in Paragraph H of Exhibit A to the Agreement was in the initial draft [of the Agreement] presented by Ladenburg." *Id.* at ¶ 6. He "proposed no revision to and had no conversation about Paragraph H [with his client], and . . . there are no redlines or comments related to Paragraph H" in the exhibit to his

declaration. *Id.* at ¶ 8. "To the best of [his] understanding, the parties did not discuss Paragraph H" at that time. *Id.*[7]

During the second draft of the Agreement, Catchur "proposed no revision to and had no conversation about Paragraph H, and the redlines do not reflect any comments related to Paragraph H." *Id.* at ¶ 10. "To the best of [his] understanding, the parties did not discuss Paragraph H at this juncture either." *Id.*

Catchur believes that **"the parties did not specifically discuss, negotiate, or bargain for the inclusion of, or meaning of, Paragraph H"** and "to the best of [his] current recollection and understanding, **neither of the parties discussed any waiver or supersedence of arbitration**." *Id.* at ¶¶ 11–12 (emphasis added).

The parties' declarations are consistent: the venue selection clause was included in the Agreement since the first draft provided by Ladenburg to Oragenics. But it was not specifically bargained-for, negotiated, or even discussed by the parties in the formation of the Agreement or in the subsequent amendments. There was also no discussion about FINRA arbitration or the waiver of any right to arbitration.

Thus, Plaintiff's representation at the April 26, 2024 hearing -- that the parties negotiated and agreed with the assistance of counsel that all disputes could be resolved in court -- is not borne out by the declarations. While the parties are certainly

---

[7]     Catchur did not directly communicate with any Ladenburg representative or attorney. [ECF No. 22, ¶ 4]. He communicated only with Oragenics. *Id.*

sophisticated entities and at least Oragenics was represented by counsel, it does not appear that the parties even discussed (much less negotiated) the venue selection clause or the waiver of FINRA arbitration.

Moreover, while Plaintiff makes much of the sophistication of the parties, the Undersigned notes that the entities who successfully pursued FINRA Rule 12200 arbitrations in *Reading Health Sys.* and *Carilion Clinic* (a not-for-profit health system who issued more than $500 million in debt[8] and "a not-for-profit healthcare organization that operates hospitals and clinics in Virginia" who issued $308 million in bonds,[9] respectively) were large, sophisticated non-profit entities. These were not small, family-run mom-and-pop shops. But the appellate court ruled in their favor and held that the venue selection provisions did not supersede the FINRA rule requiring arbitration.

### 4.      Lack of Controlling Authority and Circuit Split

At the hearing, Plaintiff acknowledged (as it must) that neither the Supreme Court nor the Eleventh Circuit have ruled on what level of specificity is needed for a forum selection clause to override FINRA Rule 12200. Moreover, among the four circuit courts that have addressed it, there is an even, 50-50 split. Two of the circuits (the Second and

---

[8]      *Reading Health Sys.*, 900 F.3d at 90.

[9]      *Carilion Clinic*, 706 F.3d at 321, 327.

the Ninth Circuits) agree with Plaintiff's position and two of the circuits (the Third and

Fourth Circuits) agree with Defendant.

The circuit court cases supporting Plaintiff's position are *Goldman, Sachs & Co. v.

City of Reno*, 747 F.3d 733 (9th Cir. 2014) and *Goldman, Sachs & Co. v. Golden Empire Sch.

Fin. Auth.*, 764 F.3d 210 (2d Cir. 2014). The circuit court cases supporting Defendant's

position are *Reading Health Sys.*, 900 F.3d 87 and *Carilion Clinic*, 706 F.3d 319.

The circuit court cases discussed below concern agreements to issue debt in the

form of auction rate securities ("ARS").[10] All four cases involve entities which suffered

massive financial losses through ARS and sought to pursue arbitration against FINRA

members pursuant to Rule 12200. The FINRA members sought to enforce forum selection

clauses in broker-dealer agreements requiring in-court litigation.

---

[10]     As one district court explained:

> The concept [of ARS] is to finance long term debt at short term rates. At
> each periodic auction, ARS investors submit bids for the number of ARS
> they wish to purchase, hold, or sell at an auction and the lowest rate they
> will accept. If the buy/hold orders meet or exceed sell orders, then the
> auction succeeds. Alternatively, if the supply exceeds demand, the auction
> fails and the issuer is forced to pay a higher rate of interest in order to
> penalize it and to increase investor demand. The concept appeared to work
> well until the recession began in 2007–2008.

*Goldman, Sachs & Co. v. N. Carolina Mun. Power Agency No. One*, No. 13 CIV. 1319 PAC,
2013 WL 6409348, at *1 (S.D.N.Y. Dec. 9, 2013) (citations and internal quotations marks
omitted).

In *Carilion Clinic*, 706 F.3d 319, the Fourth Circuit was the first of the four circuit courts to address this issue. "[It] conclude[d] that Carilion [Clinic ('Carilion')], by purchasing UBS [Financial Services, Inc. ('UBS')] and [Citigroup Global Markets, Inc. ('Citi')] services, was indeed a 'customer' entitled to arbitration under FINRA Rule 12200 and that the forum selection clause relied on by UBS and Citi did not have the effect of superseding or waiving Carilion's right to arbitrate." *Id.* at 321.

The forum selection clause at issue stated that: "all actions and proceedings arising out of this Agreement . . . shall be brought in the United States District Court the County of New York." *Id.* at 328.

The Fourth Circuit "agree[d] with UBS and Citi that the obligation to arbitrate under FINRA Rule 12200 [could] be superseded and displaced by a more specific agreement between the parties." *Id.* But it noted that "**[a]ny such provision . . . must be sufficiently specific to impute to the contracting parties the reasonable expectation that they are superseding, displacing, or waiving the arbitration obligation created by FINRA Rule 12200**." *Id.* (emphasis added).

The appellate court rejected UBS and Citi's argument that the phrase "actions and proceedings" in the forum selection clause included arbitration. *Id.* at 329–30. Instead, it found that:

> a more natural reading of the forum selection clause to require that any *litigation* arising out of the agreement would have to be brought in the United States District Court in New York County and that as to any such action or proceeding, a jury trial would be waived. And [the court]

believe[d] that **it would never cross a reader's mind that the clause provides that the right to FINRA arbitration was being superseded or waived. No word even suggesting supersedence, waiver, or preclusion exists in the sentence**.

*Id.* at 330 (italics emphasis in original; bold emphasis added). Because arbitrations were not "actions and proceedings," the *Carilion Clinic* Court held that the forum selection clause did not "supersede[ ], displace[ ], or waive[ ] the arbitration otherwise provided by FINRA Rule 12200." *Id.*

The Ninth Circuit in *City of Reno* acknowledged the *Carilion Clinic* decision, but it nonetheless found "that the forum selection clauses in the parties' contracts superseded any right to FINRA arbitration[.]" 747 F.3d at 736. At the outset, the appellate court concluded that the City of Reno ("Reno") was a customer of Goldman, Sachs & Co. ("Goldman"). *Id.* at 741.

It "agree[d] with Goldman that a contract between the parties can supersede the default obligation to arbitrate under the FINRA Rules." *Id.* The forum selection clause at issue stated that "all actions and proceedings . . . shall be brought in the . . . District of Nevada." *Id.* The Ninth Circuit found that this language sufficiently demonstrated the parties' intent not to arbitrate claims arising from the contract. *Id.* Thus, while "Goldman had a default obligation to arbitrate with its customers under the FINRA Rules," it "was free to make alternative arrangements with each individual customer when the parties formed or modified their contractual relationship." *Id.*

24

The appellate court did not apply the presumption in favor of arbitration because "while doubts concerning the scope of an arbitration clause should be resolved in favor of arbitration, the presumption does not apply to disputes concerning whether an agreement to arbitrate has been made." *Id.* at 743 (quoting *Applied Energetics, Inc. v. NewOak Cap. Mkts., LLC*, 645 F.3d 522, 526 (2d Cir. 2011)).

Quoting *Carilion Clinic*, 706 F.3d at 328, the appellate court noted that "to avoid arbitration, the forum selection clauses to which Goldman and Reno agreed need only be 'sufficiently specific to impute to the contracting parties the reasonable expectation that they are superseding, displacing, or waiving the arbitration obligation created by FINRA Rule 12200.'" *Id.* at 743. It then concluded that, based on the text of the forum selection clauses, "Reno has clearly and unambiguously disclaimed any right it might otherwise have had to FINRA arbitration." *Id.*

In reaching this conclusion, the appellate court rejected Reno's argument that "the phrase 'all actions and proceedings' refer[ed] only to judicial proceedings and [was] not incompatible with Reno enforcing its rights under FINRA Rule 12200." *Id.* In doing so, the Ninth Circuit acknowledged that the *Carilion Clinic* Court (and a Minnesota district court) "ha[d] held that the phrase 'all actions and proceedings' [was] in fact limited to judicial proceedings, while the Southern District of New York [in *Goldman, Sachs & Co v. N.C. Mun. Power Agency No. One*, No. 13–CV–1319, 2013 WL 6409348, at *7 (S.D.N.Y. Dec. 9, 2013) and *Goldman, Sachs & Co. v. Golden Empire Sch. Fin. Auth.*, 922 F. Supp. 2d 435

25

(S.D.N.Y. 2013)] ha[d] held that the very same phrase, 'by its plain terms, encompasses arbitration[.]'" *Id.* (citations omitted).

The Ninth Circuit sided with the Southern District of New York and cited the following reasons for doing so: (1) "because the presumption in favor of arbitrability [did] not apply here, the forum selection clauses need only be sufficiently specific to impute to the contracting parties the reasonable expectation that they would litigate any disputes in federal court;" (2) "[i]n common parlance, an arbitration [was] certainly an action or a proceeding" and "it [was] of little significance that the N.Y. C.P.L.R. contemplate 'actions' or 'proceedings' in the civil judicial context;"[11] (3) it rejected the argument that reading the phrase "actions and proceedings" to include arbitration would make no sense because it had already determined that "the term 'arbitration' [fell] under the broad umbrella of 'all actions and proceedings'" and "Goldman and Reno ha[d] agreed to bring their claims in a judicial action in the District of Nevada, even if those same claims might otherwise have been raised in an arbitral forum in the absence of the forum selection clauses;" (4) it also rejected the argument that reading the phrase "actions and proceedings" to include arbitration would be "nonsensical" given the clauses' reference to a jury trial waiver because the jury trial waiver merely stated the obvious, that certain actions permitted jury trial and the forum selection clause merely clarified that in those

---

[11]    The agreements between Goldman and Reno were governed by New York law. *City of Reno*, 747 F.3d at 745 n.3.

instances, the right to a jury trial was forfeited; and (5) because the presumption in favor of arbitration did not apply, "the mere availability of an alternative reading of the forum selection clauses [where they could be read to compel arbitration but require that enforcement of any award take place in the District of Nevada was] beside the point." *Id.* at 744–46.

Approximately four-and-a-half months later, the Second Circuit issued its decision in *Golden Empire Sch. Fin. Auth.*, 764 F.3d at 212. The Second Circuit addressed in a single opinion two district court orders granting motions to enjoin FINRA arbitrations. *Id.* In both instances, the appellate court affirmed the district court's finding that "the FINRA arbitration rules ha[d] been superseded by forum selection clauses requiring 'all actions and proceedings' related to the transactions between the parties to be brought in court." *Id.*

The Second Circuit "h[e]ld that a forum selection clause requiring 'all actions and proceedings' to be brought in federal court supersede[d] an earlier agreement to arbitrate." *Id.* at 215. In reaching this conclusion, the appellate court noted that "[b]ecause the question presented [ ] concern[ed] whether an arbitration agreement remain[ed] in force in light of a later-executed agreement, the presumption [in favor of arbitration] d[id] not apply. *Id.* ("[W]hile doubts concerning the scope of an arbitration clause should be resolved in favor of arbitration, the presumption does not apply to disputes concerning whether an agreement to arbitrate has been made." (quoting *Applied Energetics, Inc.*, 645

F.3d at 526)). It also noted that "[i]n this Circuit, . . . there is no requirement that the forum

selection clause mention arbitration." *Id.* (citations omitted).

The appellate court determined that the forum selection clause at issue, which

stated that "'all actions and proceedings . . . shall be brought' in the Southern District of

New York was 'all-inclusive and mandatory.'" *Id.* at 216.

It further noted that:

> the later-executed agreements have a merger clause stating that they
> "contain the entire agreement between the parties relating to the subject
> matter hereof." These provisions require that disputes arising out of the
> broker-dealer agreements be adjudicated in the Southern District of New
> York, and they thus supersede[d] the background FINRA arbitration rule.

*Id.*

Moreover, the Second Circuit, expressly disagreeing with the *Carilion Clinic* Court,

stated that "[i]t seems plain that the general understanding of 'actions and proceedings'

encompasses arbitrations." *Id.* at 217. It also noted that while the *Carilion Clinic* Court

"'expect[ed] that a clause designed to supersede, displace, or waive arbitration would

mention arbitration,' *Carilion Clinic*, 706 F.3d at 329, [ ] that [wa]s not the law of [the]

[Second] Circuit[.]" *Id.* Thus, the Second Circuit concluded that "the forum selection

clause at issue . . . [was] plainly sufficient to supersede FINRA Rule 12200." *Id.*

The most recent decision is the Third Circuit's decision in *Reading Health Sys.*, 900

F.3d 87. The *Reading* Court was concerned with:

> an emerging trend in the brokerage industry. Ordinarily, broker-dealers, as
> members of the Financial Industry Regulatory Authority (FINRA), are

> required by FINRA Rule 12200 to arbitrate all claims brought against them by a customer. **Seeking to avoid this obligation to arbitrate, broker-dealers have begun inserting forum-selection clauses in their customer agreements, without mentioning the customer's right to arbitrate**. This practice, which has been condoned by several of our sister circuits, deprives investors of the benefits associated with using FINRA's arbitral forum to resolve brokerage-related disputes.

*Id.* at 90 (emphasis added; footnote omitted).

The forum selection clause in *Reading* stated that "'all actions and proceedings arising out of' the agreements or underlying ARS transactions had to be filed in the District Court for the Southern District of New York." *Id.* Reading Health System ("Reading") filed a statement of claim with FINRA in connection with J.P. Morgan Securities LLC's ("J.P. Morgan") handling of ARS offerings. *Id.* When J.P. Morgan refused to arbitrate, Reading filed an action in the Eastern District of Pennsylvania seeking a declaratory judgment compelling a FINRA arbitration. *Id.* J.P. Morgan filed a motion to transfer the action to New York pursuant to the forum selection clauses in some (but not all) of the agreements. *Id.*

The District Court denied the motion to transfer and ordered J.P. Morgan to participate in the FINRA arbitration. *Id.* On appeal, the Third Circuit affirmed both rulings. *Id.*

Concerning the forum selection clause, the Third Circuit stated that there were "two competing rights at stake": "Reading['s] [ ] right [under FINRA Rule 12200] to resolve its substantive claims against J.P. Morgan through FINRA arbitration" and "J.P.

Morgan['s] [ ] contractual right [by virtue of the forum selection clause] to litigate those claims" in court. *Id.* at 100–01. The appellate court also recognized that "[a]ttempts to reconcile the tension between a broker-dealer's right to litigate pursuant to a forum-selection clause and a customer's corresponding right to arbitrate under FINRA Rule 12200 have divided . . . [the] circuit courts." *Id.* at 101. It noted that "[t]he Second and Ninth Circuit Courts of Appeals have held that a materially identical forum-selection clause requires the parties to litigate in federal court, while the Fourth Circuit Court of Appeals has held that Rule 12200 requires the parties to arbitrate, notwithstanding the presence of a forum-selection clause." *Id.*

The *Reading* Court "agree[d] with the Fourth Circuit that the forum-selection clauses in the broker-dealer agreements [were] insufficient to waive Reading's right to arbitrate under FINRA Rule 12200." *Id.* It also "agree[d] with the Fourth Circuit that the question is one of waiver[.]" *Id.* at 102.

The *Reading* Court rejected an expansive view of waiver. In doing so, it relied on earlier, Third-Circuit precedent, for the "well-established principles" that: (1) a "party signing a waiver must know what rights it is waiving[;]" and (2) "the strong federal policy, embodied in the [Federal Arbitration Act ("FAA")], favoring arbitration whenever doubts arise as to whether a dispute is arbitrable." *Id.* at 103 (citing *Patten Sec. Corp. v. Diamond Greyhound & Genetics, Inc.*, 819 F.2d 400, 407 (3d Cir. 1987)).

In concluding that "Reading did not waive its right to arbitrate by agreeing to the broker-dealer agreements," the Third Circuit noted that:

> any reference to arbitration is "[c]onspicuously absent from" the forum-selection clauses. **Without a specific reference to arbitration, the forum-selection clause requiring parties to litigate actions "arising out of" the contract and related transactions lacks the specificity required to advise Reading that it was waiving its affirmative right to arbitrate under FINRA 12200**.

*Id.* at 103 (quoting *Patten Sec. Corp.*, 819 F.2d at 407) (emphasis added). It also noted that "had J.P. Morgan wanted Reading to waive its right to arbitrate, it should 'have made a reference to arbitration' in either the waiver provision or forum-selection provisions of the broker-dealer agreements." *Id.* (quoting *Patten Sec. Corp.*, 819 F.2d at 406–07).

Lastly, the Third Circuit was "reluctant to find an implied waiver" where:

> Reading's right to arbitrate is not contractual in nature, but rather arises out of a binding, regulatory rule that has been adopted by FINRA and approved by the SEC. **By condoning an implicit waiver of Reading's regulatory right to arbitrate, [the appellate court] would erode investors' ability to use an efficient and cost-effective means of resolving allegations of misconduct in the brokerage industry and thus undermine FINRA's ability to regulate, oversee, and remedy any such misconduct**.

*Id.* at 103 (emphasis added). The *Reading* Court concluded by stating that in reaching this holding, "[it] split with some of [its] sister circuits, but [began] the process of closing [the] contractual loophole to FINRA's compulsory arbitration rule." *Id.* at 103–04.

### 5.   Plaintiff's Failure to Carry Its Burden on the First Factor

"'A substantial likelihood of success on the merits requires a showing of only *likely* or probable, rather than *certain*, success.' This factor is 'generally the most important' of

the four factors." *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1271 n.12 (11th Cir. 2020) (quoting *Schiavo*, 403 F.3d at 1232 (11th Cir. 2005) (emphasis in original)).

Ladenburg has not met its burden to establish a substantial likelihood of success on the merits for two reasons. **First**, there is no binding Supreme Court or Eleventh Circuit on-point decision and there is an even split in the circuits. Thus, Plaintiff is faced with a situation where there is no binding precedent and no majority view among the circuit courts that have grappled with this issue. As the Ninth Circuit recognized in *City of Reno*, this issue is a close call. 747 F.3d 733, 744 (9th Cir. 2014) ("Although the precise question is new in our court, it has been the subject of litigation in federal courts around the country. . . . We have benefitted from the thoughtful opinions of these courts and recognize that the question is a close one.").

Thus, Plaintiff's path to victory is indeterminate (and certainly not "likely" or "probable"). Under these circumstances, the Undersigned cannot conclude that Ladenburg has cleared the first hurdle to obtaining injunctive relief. *See Monticello Banking Co. v. Consumer Fin. Prot. Bureau*, No. 6:23-CV-00148-KKC, 2023 WL 5983829, at *2 (E.D. Ky. Sept. 14, 2023) (finding factor was not met where "[g]iven this **circuit split**, the likelihood of success on the merits [was] uncertain as the Supreme Court could rule

either way" and "[u]nder these unique circumstances, this factor [did] not tip the scale in either direction") (emphasis added).[12]

**Second**, wading into the murky waters of this split in authority, the Undersigned notes that to constitute a valid waiver of Rule 12200, a venue/forum selection clause must provide adequate notice to the contracting party that it is forfeiting the right to arbitrate. The venue selection clause in the instant case -- which states, in relevant part that "[t]he Company agrees that the sole and exclusive venue for any matters arising hereunder shall be the court of competent jurisdiction in Miami-Dade County, Florida" -- does not do so.

As noted in *Reading* a "party signing a waiver must know what rights it is waiving." 900 F.3d at 103. This venue selection clause does not mention arbitration, or FINRA Rule 12200, or otherwise put Oragenics on notice that it is waiving its right to arbitrate.

Like the *Carilion Clinic* Court noted, "it would never cross a reader's mind that the clause provides that the right to FINRA arbitration was being superseded or waived. No word even suggesting supersedence, waiver, or preclusion exists in the sentence." 706 F.3d at 330; *see also Reading Health Sys.*, 900 F.3d at 103 ("Without a specific reference to arbitration, the forum-selection clause requiring parties to litigate actions 'arising out of'

---

[12]    At the hearing, Ladenburg's counsel conceded that the substantial likelihood of success on the merits requirement means something greater than a 50% likelihood of prevailing.

the contract and related transactions lacks the specificity required to advise Reading that it was waiving its affirmative right to arbitrate under FINRA 12200.").

Here, the parties' declarations [ECF Nos. 22; 24] affirm that the venue selection clause itself was never negotiated (or even discussed) between the parties and there was no discussion of a waiver of arbitration. In fact, Oragenics' counsel attested that:

> to the best of [his] current recollection and understanding, **neither of the parties discussed any waiver or supersedence of arbitration**, and [he] [did] not believe, nor [was] it [his] understanding or the understanding of Oragenics, that Paragraph H includes or implies any waiver or supersedence of Ladenburg's obligation to arbitrate its business disputes with customers in [FINRA] as a FINRA Member, or alternatively of Oragenics' right to arbitrate in FINRA as a customer of Ladenburg.

[ECF No. 22, ¶ 12 (emphasis added)].[13]

The Undersigned acknowledges that the venue selection language here is somewhat different than the language in the contracts in the four appellate cases because it concerns "any matters" and does not mention "actions and proceedings." But the paragraph still omits any reference to arbitration and any express indication that the mandatory arbitration FINRA rule would be inapplicable.

---

[13]     The parol evidence rule generally provides that evidence "of a prior or contemporaneous oral agreement is inadmissible to vary or contradict the unambiguous language of a valid contract . . . when the parties intend that a written contract incorporate their final and complete agreement." *Ungerleider v. Gordon*, 214 F.3d 1279, 1282 (11th Cir. 2000). But the declarations do not concern other oral agreements, nor do they contradict the contractual language. Instead, they primarily outline the *circumstances* surrounding the execution of the contract (*i.e.*, there was no discussion or negotiations about the venue selection clause).

The Undersigned is also persuaded by the concerns in *Reading* that "[b]y condoning an implicit waiver of [a customer's] regulatory right to arbitrate, [the Court] would erode investors' ability to use an efficient and cost-effective means of resolving allegations of misconduct in the brokerage industry and thus undermine FINRA's ability to regulate, oversee, and remedy any such misconduct." 900 F.3d at 103.

The Undersigned notes that the *Reading* Court "invoked the strong federal policy, embodied in the FAA, favoring arbitration whenever doubts arise as to whether a dispute is arbitrable," 900 F.3d at 103, whereas the decisions in the Second, Fourth, and Ninth Circuits[14] noted that the presumption applies only to the scope of arbitration and not to the issue of whether there is an agreement to arbitrate in the first place.

In any event, the primary issue is one of notice and whether a waiver was knowingly made. Ladenburg's venue selection clause failed to provide Oragenics with notice that it was purposefully waiving an important right. Of course, there may well be instances where a venue/forum selection clause *does* supersede FINRA Rule 12200.

---

[14]    *See Golden Empire Sch. Fin. Auth.*, 764 F.3d at 215 ("Because the question presented here concerns whether an arbitration agreement remains in force in light of a later-executed agreement, the presumption [in favor of arbitration] does not apply."); *Carilion Clinic*, 706 F.3d at 324 n.2 ("federal policy creating a presumption in favor of arbitration, . . . applies only where a validly formed and enforceable arbitration agreement exists and its scope is ambiguous. . . . in this case we address whether Carilion was a customer as a question of contract law and without considering the presumption in favor of arbitration"); *City of Reno*, 747 F.3d at 742 ("The presumption in favor of arbitrability applies only where the *scope* of the agreement is ambiguous as to the dispute at hand, and we adhere to the presumption and order arbitration only where the presumption is not rebutted." (emphasis in original)).

However, this instance is not one of them. Had Ladenburg used more-specific language and expressly flagged the waiver result in the clause, then the contractual interpretation scenario would be markedly different.

Plaintiff's failure to carry its burden on the first factor ends the Court's inquiry. *See Am. C.L. Union of Fla., Inc.*, 557 F.3d at 1198 ("Failure to show any of the four factors is fatal, and the most common failure is not showing a substantial likelihood of success on the merits."); *Bloedorn v. Grube*, 631 F.3d 1218, 1229 (11th Cir. 2011) (If a movant "is unable to show a substantial likelihood of success on the merits, we need not consider the other requirements."); *Church v. City of Huntsville*, 30 F.3d 1332, 1342 (11th Cir. 1994) ("Because we conclude that the plaintiffs failed to establish a substantial likelihood of success on the merits, we will not address the three other prerequisites of preliminary injunctive relief.").

## V.     Conclusion

The Undersigned **respectfully recommends** that the District Court **deny** Plaintiff's motion for a TRO and a preliminary injunction.

## VI.    Objections

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendations within which to file written objections, if any, with United States District Judge Darrin P. Gayles. Each party may file a response to the other party's objection within fourteen (14) days of the objection. Failure to file objections

timely shall bar the parties from a de novo determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).

 **RESPECTFULLY RECOMMENDED** in Chambers, in Miami, Florida, on May 3, 2024.

        _____

        Jonathan Goodman
        UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
The Honorable Darrin P. Gayles
All Counsel of Record